A92A0342. IN THE INTEREST OF S. H. et al., children.
(418 SE2d 454)

BIRDSONG, Presiding Judge.

The natural mother appeals the order of the superior court terminating her parental rights to her minor children.

The children, two girls and a boy, originally were placed in a shelter following allegations of sexual abuse of the girls by both their natural parents. Subsequently, an adjudicatory hearing was held; the court found the children deprived and ordered custody with the county DFCS. This order was not appealed. Appellant mother thereafter entered a guilty plea to a total of 14 counts, pertaining to the two female children, consisting of enticing a child for indecent purposes, child molestation, aggravated sodomy and incest. The mother, as to most of these counts, had aided, abetted and watched her husband; but, as to some counts she was a perpetrator. She is currently in prison serving a twenty-year sentence, sixteen years to serve and four years probation. The children's natural father, who also is in prison, voluntarily and knowingly relinquished his parental rights at

the termination hearing.

At the termination hearing, appellant mother testified that she had been a mental case and had suffered from severe depression and delusional compulsion in the acts of molestation; that she is taking medicine for her depression and is receiving mental health counseling; that although she had engaged in sexual activity in the presence of the minor, female children, her husband had forced her to do so and it was not of her will; that she also had engaged in sexual acts with her children; that the same pattern of sexual conduct with her watching while her husband molested her older daughter (the half-sister) was the same pattern of sexual conduct which existed when she pled guilty to the counts relating to her minor, female children; that she did not contest DFCS' right to child custody; that she did not intend to have the children live with her after her projected parole date in June 1997; that the children will be of grown age when she reaches her projected parole date of June 1997; that she cannot currently provide support for the children but she would if she could; that she has 37 college hours and is studying to be a cosmetologist so she can work and earn her RN degree when she gets out of prison; that she does not know if her guilty pleas were voluntary as she was in a state of mental depression at the time; that she would lapse into severe states of mental depression twice a year before being incarcerated, but she has experienced depression more often since being locked up; and, that she is "not asking that [the children] be placed back with [her. Her] only concern was that [she] wanted to be able [for the children] to visit [her] while [she] was in prison . . . because [she] loves them."

Physical examination, conducted prior to the deprivation hearing, revealed that one of the female, minor children had warts in the vaginal area and chlamydia of the vagina and rectum; another female, minor child had chlamydia orally and in the vagina and rectum.

The half-sister of the minor children who was married and then age 20 testified at the deprivation hearing regarding how she had been molested by her father in her mother's presence. Her 11-year-old half-sister told her that the father had once hit the girl in the nose with his fist; she also was told by a half-sibling that the father "beat" the male minor child after he had observed his father in bed with his sister. At the termination hearing, the half-sister again testified her father had molested her, and her mother had been present most of the time. She also testified the father had molested her older brother. In her opinion, her minor, half-siblings should never be allowed to go back home with the mother. She further opined that her mother engages in a fantasy life about having lots of money, a big house, and that one day they would all live as a big, happy family. Even when the father is not around, the mother had boyfriends who would drink; they were alcoholics. If the children are returned home, their mother

will continue in the same lifestyle and pattern of conduct. The half-sister also testified she would be in a position to take these children and to care for them.

The foster mother testified at the termination hearing as to how the children's behavior has improved and how they have adjusted well in their foster home; that the female children do not want to live with their mother; and that she believes termination of parental rights is in the best interest of the children, as the sexual acts in which they were involved with their mother have had a definite impact on them. She also testified that she was willing to keep the children. However, she currently is not willing to adopt them as she does not know how the children might feel about it later and because of their older sister's interest in the children. She considers the important thing to be that the children have a good home in which to live; she loves the children and wants them to remain in her home.

The caseworker who interviewed the children testified at the deprivation hearing as to the various statements the girls made regarding how their father and mother had molested them and how they had been subjected to repeated acts of sodomy. The abuse continued on a weekly basis at random time periods. The minor male child informed her he had never been molested; however, he once saw his father in bed naked with his sister for which he was subsequently whipped. The boy, however, does know what has been going on sexually because his sisters told him. The mother subsequently denied being aware of the sexual abuse of the minor, female children, but admitted she was aware of the abuse of her oldest daughter. The children have adjusted to foster care, and the girls have consistently received As and Bs in school. At the termination hearing, this caseworker testified that this is one of the worst cases of child abuse "we have ever had at the agency"; and strongly recommended termination of the mother's parental rights.

The current caseworker testified at the termination hearing that the children had not expressed a desire to visit their mother in the prison. She believes it is in the children's best interest that the mother's parental rights be terminated. The caseworker would seek permanent placement for the children if parental rights were terminated either in their current foster home or with a relative; in permanent placement the children would be eligible for adoption by someone. If there is no termination, DFCS will have to seek motions for extensions of custody every two years until all children reach 18 years of age; and every two years, thus the matter concerning the molestation events would have to be "opened up again." There could be no permanent placement plan for these children if parental rights were not terminated, the only alternative then being to keep the children in foster care until they are 18 years of age. And, in her opinion, as

long as their mother is in jail and cannot take care of them, their deprivation is likely to continue.

At the termination hearing trial, the then 13-year-old, female child testified she was doing all right in her foster home and does not ever want to live with her mother again. Each of the then nine-year-old twins testified that their foster parents were good to them, and they did not want either to see or to live with their mother again. The twin boy also testified that he did not like his parents anymore because of what they had done to his sisters.

The superior court found by clear and convincing evidence that the children are deprived and deprivation will continue; that due to their incarceration the natural parents can neither care for nor support the children; that the mother suffers from severe depression at times and in the past has been under the care of Satilla Mental Health Services in Ware County; and that the parental rights of both parents should be terminated in accordance with the court's order. *Held*:

1. Pursuant to OCGA § 15-11-81 (a) there exists a two-step process in considering the propriety of termination of parental rights. First, the court shall determine whether there exists clear and convincing evidence of parental misconduct or inability; secondly, if such clear and convincing evidence exists, the court shall then consider whether termination of parental rights is in the best interest of the child, "after considering the physical, *mental, emotional,* and *moral* condition and needs of the child . . . including the need for a secure and stable home." (Emphasis supplied.) OCGA § 15-11-81 (a). With certain exceptions not here applicable, the court may terminate parental rights if the court determines parental misconduct or inability by finding that: the child is a deprived child within the meaning of OCGA § 15-11-2 (that finding was made previously and was not appealed in this case); the lack of proper parental care or control by the parents in question is the cause of the child's status as deprived; such cause of deprivation is likely to continue *or* will not likely be remedied; and the "continued deprivation will cause or is likely to cause serious physical, *mental, emotional,* or *moral* harm to the child." (Emphasis supplied.) OCGA § 15-11-81 (b) (4) (A) (iv). OCGA § 15-11-81 (b) (4) (B) provides, inter alia, that in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, the following: a medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; conviction of the parent of a felony and imprisonment therefor which has a demonstrated negative effect on the quality of the parent-child relationship; and, egregious conduct or evi-

dence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature.

The various criteria above discussed can be established by either direct or circumstantial evidence of record.

2. Initially, it is noted that appellant has been convicted of felony offenses involving her two minor daughters as victims. The very nature of these offenses would, as a matter of law, negatively impact upon the parent-child relationship both now and in the future. Further, " '[a]lthough imprisonment alone does not always compel a termination of parental rights,' it will support such a ruling when adequate aggravating circumstances are shown to exist." *In the Interest of S. K. L.*, 199 Ga. App. 731, 733 (1) (405 SE2d 903). The nature of and circumstances surrounding appellant's convictions per se establishes the requisite aggravating circumstances in this case.

3. Notwithstanding appellant's incarceration, as discussed in Division 2 above, there exists a totally independent basis for termination of parental rights. The posture of this record conclusively establishes that the children were deprived; that the parents' lack of proper care and control (by virtue of their criminal sexual misconduct toward their children) is the cause of the children's status as deprived. Moreover, there exists evidence of record, particularly regarding the nature of the mother's sexual conduct toward the children and the recurring pattern of such conduct directed toward the minor, female children, from which it could be reasonably inferred that the cause of deprivation is likely to continue or will not likely be remedied. In this regard, " 'while . . . past deprivation is not sufficient for termination without a showing of present deprivation, the past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue.' " *In the Interest of S. K. L.*, supra at 733 (1). Moreover, the mother during her testimony made admissions in judicio regarding her continuing severe mental depression and the counseling and medication she currently was receiving for the same. This mental state, particularly when viewed in light of appellant's alleged submission to the demands of her husband that she participate in the recurring sexual violation of her children, provides further evidence from which it can be inferred that the existing deprivation is likely to continue or, at least, will not likely be remedied.

4. " 'If there is clear and convincing evidence of [statutorily required] parental misconduct or inability, the court shall then consider [as was done here] whether termination is in the best interest of the child, after considering the physical, mental, emotional and moral condition and needs of the child, including the need for a secure and stable home. (Cit.)' [Cit.]" *In the Interest of R. L. H.*, 188 Ga. App.

596, 597 (373 SE2d 666). " 'Obviously, those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest.' " *In the Interest of S. K. L.*, supra at 733-734 (1). Once the trial court makes its determination " '[t]he appropriate standard of appellate review . . . is whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody were lost. . . .' [Cit.] 'The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review is not met.' " *In the Interest of S. K. L.*, supra at 734 (1); accord *In the Interest of E. P. N.*, 193 Ga. App. 742, 748 (388 SE2d 903); *In the Interest of A. T.*, 187 Ga. App. 299, 300 (370 SE2d 48). Applying these standards we find the trial court did not err in terminating appellant's parental rights. "It would be nothing short of draconian for this court to usurp the trial court's lawful functions by re-weighing evidence and re-deciding witness credibility, *when as a result we are subjecting [these children] to the likelihood . . . of continuing emotional [and moral] harm. . . .*" *In the Interest of E. P. N.*, supra at 748-749 (2c). "Our state constitution provides '(p)rotection to *person[s]* and property is the paramount duty of government.' (Emphasis supplied.) Ga. Const. of 1983, Art. I, Sec. I, Par. II. This constitutional right of protection extends equally to children as well as adults. 'In the United States, the *parens patriae* function belongs with the states.' [Cit.] We should not pay mere 'lip service' to this grave obligation by preserving in legal fiction an already harmful and deteriorated parent-child relationship." *In the Interest of E. P. N.*, supra at 749 (2c).

*Judgment affirmed. Beasley and Andrews, JJ., concur.*

DECIDED MAY 1, 1992.

*McGee & McGee, J. B. McGee, Jr.*, for appellant.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Margot M. Cairnes, Staff Attorney, C. Deen Strickland*, for appellee.